Good morning, ladies and gentlemen. Judge Rovner is joining us by video connection. It's possible you may encounter, when you're arguing, a second or two of delay, but please be patient with us on that. Also, for the benefit of those arguing later cases, after the second argument today, the Court will be taking a ten-minute recess. The first case for today is Securities and Exchange Commission v. First Choice Management with the appeal of Receiver Joseph Bradley, Mr. Sullivan. And that is No. 18-1516. Good morning, Your Honors. Please, the Court, I'm here on behalf of the Receiver to seek reversal of the last ruling of the District Court in our case, and that's Docket No. 1115. It's a decision that departs fairly seriously from the past excellent jurisprudence that we've had in this case. This is the first time we've had to appeal a ruling, but it's put the Receiver in a very awkward position trying to close the case and not being able to access the one asset that it thought was going to be available to do that. Let me explain that for a second because we weren't usually in the business of putting our litigation strategy and our budget strategy in public filings. I don't think it's going to matter anymore, so I'm going to go ahead and divulge that. We've been blessed with a Receiver who's got many years of experience. Mr. Sullivan, forgive me for interrupting, but this has been really bothering me a great deal. Was the Railroad Commission subject to the freeze order? It appears to me that it was the Bank of America that violated the freeze order, if anyone did, yet the Receiver did not pursue the bank. I keep wondering why not. Footnote 4 on page 9 of the reply brief provides no real explanation for why the Receiver did not pursue the bank, and I really would greatly appreciate your helping me with that. Yes, and I was about to get to some of that point. Certainly the Railroad Commission was subject to the freeze order. It was served with it immediately. That was a finding of the District Court on page 8 of the decision we're seeking to have reversed, and what I was getting to was why we left the funds on deposit at Bank of America, even though we did serve ALCO, the Texas Railroad Commission, and the Bank of America with the freeze order, which froze any defrauded investor funds, and no one objected to our claim at the time. The finding that we've claimed these bond funds since the beginning has also already been made by the District Court, and what I was going to get at is we haven't been in the business of exposing our litigation strategy and our budget strategy, but this was the highest rated asset we had, and we've been blessed with a receiver who's got many years as a trustee, and we rated all the assets when we had them in the estate, and this one in particular was one that was going to be able to be used at the end of the case when we needed to close the case, and the reason we didn't liquidate it before is because once you have that money sitting in the receiver's bank account and the receiver has to report that to the court, all kinds of letters come in from the defrauded investors. Here's my question. Why did the receiver pursue the Railroad Commission in the first place? Why not start with the Bank of America? When did the receiver become aware that the bank had transferred the funds to the Railroad Commission? Well, for certain when we made the turnover claim. If you look at the past reports of the receiver, the receiver believed that the funds were still on deposit at Bank of America. In fact, if you look at an order back in 2008, there's a receiver report which discusses going after the bond funds at Bank of America when it would be time to litigate the case. But again, we did not want to have those funds on deposit before we were ready to close the case because what happens if you do is you'll have to end up getting rid of those funds, you'll have to distribute them, and then we won't have any assets to be able to go after some of the contested claims. And that's why this asset was rated so high and we were going to procure it last. If you look at our order in 2014, the January 7, 2014, Document 891, where the court does expressly say that those funds were frozen. This is the district court saying those funds were frozen on account at Bank of America. So if they were frozen at Bank of America and then somehow they ended up at the Texas Railroad Commission in answer, we still don't have yet. We don't know how that happened because they haven't divulged that. But we do know those funds are on deposit now at the Texas Railroad Commission, and that's also a finding that the court. They're part of the state treasury, correct? That's what we're told. The cleanup fund, I think, Your Honor. Can I ask you, is it correct that in 2006 the receiver designated ALCO as the operator of these oil and gas leases in Texas? We used the word appointed and designated, but they were already the operator. They were the operator. But you designated them. No. The Railroad Commission approved them as operator. We acknowledged that they were already the operator. They're your leases, right? Yes. Because they belong to the receivership estate, right? Yes. Okay. Let me just tell you one of the things that troubles me about this is that the receiver and ALCO both seem to be trying to tell the court that ALCO was not really operating these wells for purposes of this appeal. But presumably you've been telling the lessors or other people with potential reversionary interests in those oil and gas leases that it was operating at least enough to prevent reversion or forfeiture on a theory of non-production. That's correct. Okay. That sounds a lot to me like heads we win, tails you lose, and we get to skate back and forth between those two positions. Well, I don't even think that's relevant to begin with, Your Honor, because of the fact that the bonds were all- Indulge me for a moment. Okay. And please address it. Certainly. Certainly. The bond funds were already sequestered from ALCO. We made the claim on them very early on, as soon as we got the freeze order. They were always encompassed by 28 U.S.C. 754. But when we went to ALCO, we went to the Texas Railroad Commission, we claimed the bond as the district court found on page 8 of its ruling, and there was no objection. We believe that they were always sequestered from the situation. That's fine. But let's address the district judge's rationale, which is if you're operating oil and gas wells in Texas, you've got to provide financial assurance that's run through the Railroad Commission. But ALCO was already an operator. This is the point I'm trying to make here. The fortuitous opportunity for fraudster Michael Wilson to come across the $250,000 and then place that into financial assurance, even though he was already an operator. He already had financial assurance. He was already an operator with the Railroad Commission. Whether he was trying to launder those funds, whether he was trying to expand the capacity of his ability to fraud, we don't know. But when we found the funds at Bank of America, we had them sequestered away from Michael Wilson. And amazingly, that's one of the reasons. But under Texas law, somebody who's operating oil and gas wells, as I understand this, please correct me if I'm wrong, has to provide financial assurances satisfactory to the Texas Railroad Commission that will provide assurances for adequate cleanup, right? And ALCO did. With these funds, right? No, before they ever came across our funds. They were already an operator in Texas. They already own the same leases that they sold to us. The $1.2 million that went into ALCO was to buy those leases from ALCO. So not only did they already have financial assurance, Your Honor, but we made clear. The financial assurance that the district judge is dealing with is the $250,000 here, right? It's now in the general treasury of the state of Texas. Yes, it was on deposit at Bank of America. So why was it on deposit? It seems to me that you're answering Judge Hamilton's question by saying, well, we never had to put up any money to begin with. So why was the $250,000? This is the receiver following defrauded investor funds. We were a few months behind the defrauded investor funds that came into Michael Wilson's hand. He's already an operator. He's running all kinds of oil and gas wells in Texas. He doesn't need this extra $250,000 to operate wells. That's what he already does. I can't answer. It's a fraud. I don't know why he put them on deposit if there was an opportunity to launder the funds. But we immediately froze them, and we immediately went to the Railroad Commission, and we're in front of the Railroad Commission continuously, as the district court found on page 8 of its opinion. In fact, there's a letter from myself out in the record regarding turnover where it says that I had served them eight times with a freeze order and made claim to the bond. And we were continuously reminding them that that bond is sequestered, and that's not part of ALCO anymore. So when ALCO was designated, which I know in hindsight is a bad choice of words given where we are today. We never obviously didn't think we would be where we are now. But they were already operating, and we just wouldn't deal with ALCO until Michael Wilson was gone and we had somebody that we could call the operator so we could sell the leases. We never wanted to operate the leases. We were always in liquidation mode. Unfortunately, sometimes, yeah, that ran into litigation mode. But we were always in liquidation mode, and as soon as we had the freeze order, we went to the Texas Railroad Commission and wanted to liquidate these assets, and they would not let us get rid of Michael Wilson. So when we read about public welfare, we were the ones actually trying to get rid of Michael Wilson who was defrauding the public using these leases and doing such an awful job upkeeping these wells. These wells, by the way, they're 80 years old. Let me ask a question related to Judge Rovner's first question. Did you go to the Texas Railroad Commission in an effort to get the money back because you knew that it wasn't at Bank of America at that point? We never went to the Railroad Commission to get the money back because it was in the hands of Bank of America. We didn't find out until we made the turnover demand that it had moved, and we still don't know exactly what the machinations were to make that happen. You know, there are several mentions in the brief, in your brief, about new facts brought forward by Texas that have not been vetted by any court. Did the receiver ask for a hearing in the district court? What relevant facts are at issue at this point? Well, we didn't know we would be where we're at or we would have asked for a hearing. What we asked for was for our summary proceedings application to go forward. The new facts are all these facts. You asked for a contempt citation, correct? We asked for a contempt, disgorgement, turnover. We filed a summary proceedings complaint, which is what we've done with every asset that's been in the hands of somebody who will not turn it over. But the new facts are related to all these cleanup issues that have never been before the court before because nobody's ever made a claim before on the bond. We thought the bond was ours with no claimants against it. That's why the receiver reports say what they say. With the court's approval of every receiver report along the way, that that's an asset that we're going to sue and liquidate as soon as we get the opportunity. And it wasn't until the turnover motion was denied that we knew that we had an issue with all these facts that had never before been. These are 80-year-old wells. The defrauded investor funds... Why does that matter? Defrauded investor funds fortuitously end up with Wilson for a few months before we file the freeze. And they're now sitting with Bank of America under a freeze. And somehow today we're talking about using those same defrauded investor funds to clean up wells that are 80 years old, that have absolutely nothing to do with the defrauded investors or the receiver. If the receiver is supposed to come in to clean up these fraudulent messes, then when we sequester some assets... Sure, it's a problem. But receivers get messes to clean up, right? Yeah. That's their specialty. And oil and gas wells, part of what you inherit is the environmental risks and those obligations. And I know you say you wanted to liquidate them. But you've had them for 10 years or more at this point, or you've had them for about 10 years. And they were operating, at least, to prevent reversion, right? Right. Well, the reason we couldn't liquidate them was because of the Railroad Commission. And that's well laid out in our briefs. And it is all over this docket. I mean, the Railroad Commission threw obstacle after obstacle at us, including to claim it to the very same oil and gas interests that we had. And just to make a clarification, Your Honor, we had leases for mineral interests. We had the oil and gas interests. The receiver didn't have any authority of its own to go out there and operate those wells. The receiver could not take possession of those wells. It had no authority to do so. That was the operator's responsibility. And ALCA was the operator. That's why we went through government. But if the leases had not been operated, then your mineral interests were subject to reversion, correct? That's correct. Or at least vulnerable to that. That's correct. Because we couldn't sell them because the new claim, it's at the Railroad Commission. So it's a mess. There is a mess. And all I was saying with that, Your Honor, is there's a freeze and turnover order to deal with those messes. And if those aren't honored, we've got what are we to rely on as a receiver? If we can't rely on the court's orders that are telling us how to marshal these assets. And, in fact, the court gave us great praise along the way for the way we scheduled it and the way we racked up the assets and had money in the tank to be able to go after more. That same order that I mentioned earlier from January 7, 2014, has a great phrase in it and how we are marshaling these assets. But we were doing that following these orders, relying on the provisions in the freeze and turnover order, the appointment orders, the stay order, to be able to make our budget decisions. And if those aren't honored, there's no ‑‑ I mean, if the money is allowed to leave from Bank of America and go to the Texas Railroad Commission, even though we have it frozen and we have everybody on notice, how is a receiver supposed to operate would be our question. Why wouldn't that freeze it? What is the receiver's best argument against the claim of sovereign immunity? Why is the Railroad Commission not entitled to sovereign immunity on this claim, do you think? Yeah, well, the NREM argument would probably be the strongest in that 28 U.S.C. 754 gave us NREM jurisdiction, which they don't object to if sovereign immunity does not apply. In fact, they said we're correct on page one of their brief as to sovereign immunity. As to the NREM jurisdiction. I do not understand your response. I'm so sorry. No, 28 U.S.C. 754 NREM jurisdiction would be our best argument as an exception to sovereign immunity. But they don't agree with that. They're asserting sovereign immunity. So you're just saying, yes, that was the basis of the district court's jurisdiction. Right. Yes. Yeah, I'm not sure. No. I don't know. You know, the entire premise of the appeal seems to be that the district court that oversaw the litigation for 18 years misinterpreted its own freeze order. Doesn't that seem unlikely? No, it doesn't, Your Honor. Given if you look at page three, there's a couple of missed sites to the freeze order, mangled dates. The attention to detail that the court used to have simply wasn't there in this decision. I don't have an answer for that other than to say the court doesn't even go into the freeze order in the decision we're trying to reverse. It doesn't mention one single word from the freeze order. You would think that would be the main document because on page eight, they do say the freeze and turnover order does govern this dispute, and yet they don't go into any of the provisions. Why it didn't automatically stay the railroad commission or the funds for moving, because that's what it says in the freeze order, and it says all claims have to be brought before the district court, and they never filed a claim or an objection or gave us any insinuation that they were going to try to fight our retaking of the bond that we thought was sequestered and out of the case. When you look at when we did. It seems as though everybody was playing a waiting game here, including the receiver. I mean, that's what you told us a little while ago at the beginning, that you thought you could just kind of leave those funds on deposit or that you wouldn't be subject to claims to distribute them. You thought that would be prudent. It turns out at least as long as this decision stands not to have been so.  You didn't force the issue. Well, we didn't know there was an issue. We're forcing it now because now we know there was an issue. We believe that we made some very wise decisions along the way, as we did with some of the other assets to get to the point where this would be the one that would pay for those dangling expenses at the end of the case. And if you look at that same order that I've cited a couple times now, just as a watershed where we're now turning to liquidate those funds, the bond funds, you can see where we've gotten rid of most of the assets and we're down to two assets left. And even there the court says that those funds were frozen at Bank of America. So that leaves an open issue. If those funds were frozen at Bank of America, the freeze order applied to them. They shouldn't be anywhere else right now. Okay. Thank you, Mr. Sullivan. We'll now hear from appellees. I think it might be best to hear first from Mr. Katz, who has five minutes in the unusual position of an appellee attacking the district court. And then, Mr. White, you've got 20 minutes for the commission. Good morning. The court is quite correct that I am in an unusual position attacking the district. Why are you even here? What is your interest, sir? What possible effect could this appeal have on ALCO's rights? In other words, does ALCO have anything to lose or gain on this appeal? Yes. I am flummoxed. What we have to gain on this appeal is relieving my client of liabilities assessed against him by the railroad commission that the district court has previously found that my client has no fault in having these liabilities incurred and should not be responsible for them. These were in the sale orders? These were the sale orders, and that's correct. The court comments that ALCO should not be responsible for this. So how could the district court in those orders decide the rights of the railroad commission? Well, that's what led us to the contempt order, led us to the attempt to show cause. In these receivership proceedings, there's a tendency to try to be pretty aggressive with the powers of the receivership court and the receiver. And so you write orders that say things like, you know, relieve from liability. But I don't see how the district court had authority to relieve ALCO of liabilities or potential liabilities toward the Texas Railroad Commission, which was not at that point a party. Or maybe I'm mistaken. The district court did that. It said it. It said it. To say you are free from liability to these strangers who are not before me. Well, the strangers had a claim against ALCO. There was a procedure set forth for asserting claims back in 2006. It may have been 2003. That procedure was never followed by the railroad commission. For claims against ALCO? If they had a claim against the receivership. No, not against the receivership, but against ALCO. Yes. If they had any claim against the receiver or ALCO, because the court in its orders refers to the receiver and ALCO in that context. And. Does ALCO still exist as an entity? ALCO exists on paper as an entity. However. Just in paper form? Yes, because the principal for ALCO has bowed out of the picture because he invested $2 million in ALCO and walked away with zero. He can no longer afford to be involved with ALCO. That's what led to the. So ALCO has no assets. ALCO has no assets unless it's an asset that's provided through the courts. And can you explain again, if you did originally, which I think I missed, how it became engaged in this dispute over the bond fund? ALCO never had a dispute over the bond funds. ALCO, my principal, Ash Mascarinis, got involved with regard to the operation. The bond funds were never an issue with ALCO until many years later, leading up until 2016 or 2017 when the turnover was requested. ALCO was not. Is ALCO liable for any amounts not covered by the bond fund that Texas expended in cleaning up these wells? No. ALCO was not. They're not responsible for any funds. Back to the first question. What are you doing here? I'm here because the Court of Appeals said I'm an employee. That's why I'm here. Well, why didn't you say to them, no, I'm not? Because the decision of the district court is adverse to ALCO. It's adverse. But you did not appeal. That's correct. Okay. Which is understandable if there are no assets. Okay. We don't mean to give you too hard a time about this, Mr. Katz, since it seems like you're in a bit of a difficult spot. But what do you think we ought to do here? Let's put it that way. The first time we ever knew that there was a claim to those funds by the Railroad Commission was when we applied for a turnover order. That is, what, 15 years after the freeze order went into effect. Sorry. Let me ask it again. What do you want this court to do? I would like this court to reverse the district court. Okay. Thank you. Okay. Mr. White for the Texas Railroad Commission. Thank you. May it please the court. This is a case about whether a federal receiver can come into the state of Texas, operate oil wells for over a decade for the benefit of the estate, abandon the unproductive wells, make the state pay to plug them, and then recoup his full financial assurance after doing so. How and when did Texas gain control of the bond fund that was held at Bank of America? Well, I think that it's not entirely clear from the record. That's what I'm asking. Yes. So the record shows that in 2003 there were funds on deposit, or at least the receiver has alleged, there were fraudulent funds on deposit with Bank of America, and the Railroad Commission had a letter of credit. All else we can tell from the record is that as of 2008, when these regulatory violations were uncovered by the Railroad Commission, ALCO, the receiver's designated operator, was no longer operating with a letter of credit for its financial assurance. There are multiple ways you can satisfy the financial assurance obligation. At that time he was operating with $250,000 cash. It is probable that at some point the $250,000 in Bank of America became the $250,000 cash. Cash that he had given to the Railroad Commission. It's not clear in the record that that's what happened. I mean, the receiver didn't put forward facts about that, but that's sort of the inference that everybody has been operating under. And the way that this financial assurance system works, there are sort of yearly requirements for operators of record. They have to file certain forms, and they have to essentially re-up their financial assurance. So we know that in between that time period, at a time when the freeze order was lifted as to ALCO, there had to have been a designation by that record operator to proceed with this cash, whether cash or a letter of credit or something else, as the financial assurance. Because anybody who is a record operator in the state of Texas has to have some form of financial assurance on file. I would like to ask you about the civil contempt order. So it seems to me that that's obviously the heart of the case. And the district court said that there was no order prohibiting the commission from... So can you address that? Because if the district court didn't know, as Judge Roebner said before, it seems unlikely that the district court was unaware of what its own order said. Yes. That's our position in this case. We are still unclear what order it is that the commission failed to follow, let alone failed to follow by clear and convincing evidence or the full standard of civil contempt. We're not sure. We think maybe it was the 2003 freeze order that they're saying, although it did not name the railroad commission. The funds were on file with Bank of America at the time. We had a letter of credit, and I think as the district court noted here, a letter of credit is an independent obligation. It can't really be frozen. You could go after Bank of America for cash, and Bank of America would still owe the commission $250,000 if we asked for it. Now, here, Texas was aware, obviously, that the receiver claimed first rights to the bond fund and that there was a freeze order that required the state to seek these regulatory funds from the court. Am I right so far? No, I think that we would dispute that actually. I mean, I think that what the receiver has shown, we don't dispute that he established jurisdiction. He filed in all the district courts in Texas this particular freeze order that doesn't name the railroad commission. He seems to be basing the fact that we were aware of all the proceedings in this case on his brief cites a bunch of e-mails showing he had kind of e-mail traffic with the railroad commission. It's not surprising, given that some of the estate's property were oil wells, that commission employees would be involved in some things because operators had to be designated in that. But I'm not aware of anything in the receivership case itself that ever noticed the railroad commission, that it had to come forward and apply a claim in order to have some interest in the bonds. I mean, part of it is also just, I mean, the district court comes out and says that the railroad commission never filed a claim in this case. All that it's really done is it's sort of a passive regulatory agency. It's where these oil wells are being operated, and the receiver has to do what everybody has to do in Texas, and that is have financial assurance on file. And it's also just sort of a common sense definition of what a bond is, that it's possible that it all gets returned to you. You know, if you leave the wells in good condition or you bring in a new operator who will bring them up to condition and satisfy all the penalties and obligations, but if you don't, you forfeit the bond. So it's unclear exactly what a claim would have looked like that we would have thought of. Oh, sorry. I am so sorry. So in that explanation, the reason why the state notified ALCO rather than the receiver or the court that it was seeking the bond funds? Well, the ALCO was the designated operator. So that's who gets noticed in that scenario. It's the operator's obligation to comply with state regulatory laws. And the receiver makes much of this idea that it's the railroad commission that appointed ALCO as operator. I mean, that's just not what the railroad commission does. It's not in the business of designating operators for owners of oil leases. It also doesn't adjudicate property rights or anything of that nature. I mean, there are just a handful of criteria you have to meet to be an approved operator in the state. I don't want to speculate as to why the receiver decided to keep ALCO on as the operator of record. I don't really know. Nothing in the district court orders explains as much. But we do know the district court itself noted in 2006 that ALCO chose or no, I'm sorry, the receiver chose ALCO to be the operator of record. And this idea that, I mean, the docket entry 476 is the joint motion from the receiver and ALCO requesting the ability to appoint ALCO as operator of record because somebody needed to be operator of record. And then that operator needed to post financial assurance in order to stay in the oil and gas business. It appears the state of Texas is out of pocket. More than $250,000 on the cleanup of the wells at issue. Who, if anyone, is liable for the remaining cost of cleanup? I mean, can Texas go after ALCO? It seems ALCO doesn't even exist except on a piece of paper. I mean, can it seek more funds from the receiver? What happens? I think the practical effect is at the time of the regulatory violations, I think that the commission probably could have filed a claim if it wanted to waive its sovereign immunity and seek a claim in the equitable receivership. I think the commission could have gone after the receiver for the half million dollars it spent cleaning things up. It elected not to file such a claim. It's just not refunding the deposit. I don't know what the practical effect would be of going after ALCO at this point. My understanding, the receiver talks about ALCO as a robotic tool and things like that of the fraudster here. My understanding, just based on the record, is that for the last 14 years or so, ALCO has been operating essentially hand-in-glove with the receiver, such that I think the district court referred to ALCO as the receiver's agent. I don't know whether all the tests for agency are satisfied, but they certainly seem to have been working in lockstep throughout the majority of this proceeding. Counsel, do we have to resolve the sovereign immunity question first, or could we just affirm based on the contempt? Yes. I think that this court has to resolve sovereign immunity first. We agree with the district court's resolution of the equities, but we think that the district court should have resolved this at the outset on sovereign immunity grounds. Why? Sorry. We don't treat Eleventh Amendment issues as going to subject matter jurisdiction, so why do we have to resolve that issue if we were to affirm? We obviously have to resolve it if we were to reverse. Well, I guess I wasn't aware of that. Our understanding, we've just asserted all along that our primary argument to the district court was that the district court lacked jurisdiction to release its opinion. So if that is in fact the case. I know it's a shock to any state governments. Yeah, I know. I'm sorry. I've just been operating under the assumption that that is first and foremost. We thought the Supreme Court makes that clear, too. Well, it's a hybrid. I mean, sometimes the court treats it like personal jurisdiction, sometimes it treats it like subject matter jurisdiction, and it could be a threshold issue that you have to resolve first anyway. It's just not clear. Well, I think in that scenario, it's operating a lot more like personal jurisdiction in this case, just because this has been going on about 19 years now, I think. The Railroad Commission, apart from these e-mails with various commission employees about matters that are going on in Texas, the Railroad Commission has never been a part of this receivership. The first time it became a part of that was when the receiver filed his motion for summary proceedings. So I just want to be clear about your position. So you're revising your initial answer and saying, no, we can just resolve it on the contempt ground and sovereign immunity is not a threshold issue that we have to waive. Well, I think if it's a hybrid system, that it sounds like we're happy to take the win either way. But to the extent that it can be conceived of as either a personal jurisdiction or a subject matter jurisdiction issue, I think here this seems like a case best suited for the former than the latter, just because there are so few ties. We're not, for instance, this is not like Hood or Katz or something like that, where we're operating kind of as a business or we're sort of a market participant or we've been involved kind of from the get-go in assets that are being distributed or divvied up. We are about as passive as you can get in this scenario. And we're involved in this case solely because some of these oil wells happen to be in the state of Texas and we had jurisdiction over them. You know, at least part of your argument seems to depend on the decision by the receiver or its agent to post the cash bond. If it turns out that the fraudster, Mr. Wilson, posted the bond, and it appears that that's the case, what happens to your argument? I mean, that would seem to indicate that Texas claimed money for the cleanup from the victims of a fraud instead of from the fraudster. I don't think it would do anything to our argument because this is, we don't care where the $250,000 comes from. In other words, what the receiver could have done here from the get-go is if he thought he had a claim to the $250,000 of Bank of America, the receiver could have taken that money. And then he could have tried to sell the wells right then and there or bring new operators in, but he decided to maybe, I assume, to maximize the benefit to the estate to keep these oil wells operational for over 10 years. And so regardless of where the money comes from, if he'd gotten that money from Bank of America then, he would have had to, as an expense of operating the estate, come up with his own $250,000 to put forward to satisfy the financial assurance obligations to continue operating the wells. So I don't really think it matters who in particular put the money up to begin with. It's reaffirmed every year to continue operating. And at some point in there we know maybe it wasn't the best decision ever for the receiver to designate Alco as the operator of the estate if the receiver didn't have complete control over Alco or if some fraudster was still involved, but that was the decision that he made. And we're not in the receivership itself. We see somebody come forward who satisfies all the requirements, has the money, and that's who becomes operator of record if designated by the owner. The receiver was acting as that at the time. Well, if you were Alco, what do you think we should do? Sorry, if who were absent? If you were Alco. I don't think that Alco should care one way or the other. I think that Alco would maybe care if we had filed a claim in this case and we were seeking the $507,000, but we're not. We elected not to. All of this money that would have been – this is talked about in this Court's 2012 opinion. Everybody knew what this bond fund was for, that anything that would have been refunded to Alco, our understanding is that would have gone straight to the receiver. So I don't really see what Alco's independent interest is in this case. So Mr. Katz can go home happy? Yes, I think he can. Yes, yeah. I think he's okay. Having been tormented, he can go home happy. Yes. I just wanted to say a few more words about sovereign immunity. The receiver has not pointed to a single case where a court has held sovereign immunity abrogated in an equitable receivership context. It's true that for day-to-day operation matters, courts in equitable receiverships will often cite to bankruptcy cases or to the bankruptcy code itself. I think both sides did that in this case. But at the end of the day, an equitable receivership is distinct from a bankruptcy proceeding. The receiver points to Katz and Hood and other bankruptcy cases to say that sovereign immunity has been abrogated here. But those cases rely on the fact that Congress abrogated sovereign immunity in the Constitution's Bankruptcy Clause. This is an equitable receivership grounded in federal securities laws passed pursuant to the Commerce Clause. A seminal tribe makes clear that Congress does not have the power to abrogate sovereign immunity under its Commerce Clause powers. And several courts of appeals observe, we talk about them in our brief, that Congress never even purported to abrogate sovereign immunity in the Securities Act and Securities and Exchange Act. There's also just the one practical distinction I want to highlight that we talk about in our brief, to treat equitable receiverships differently than bankruptcy proceedings for sovereign immunity purposes. It's one thing to say that states in some sense acquiesced to bankruptcy proceedings that are grounded in a rigid code that provides a lot of protections for them when proceeding matters they have no interest in being involved in. We have no interest in being involved in here. It would be quite another matter indeed to subject states and their treasury funds to equitable proceedings that though bankruptcy case law may be useful by analogy, really are unlimited in their scope, bounded only by the district court's overriding sense of equity. And then in this case, I mean, to the merits of this case, it really is just a question of the equities. We believe the district court that has been overseeing this case for nearly 20 years now is by far in the best position to decide the equities and to interpret its past orders. And in any event, the equities do not favor the receiver here. It's the receiver who designated ALCO as the operator of the estate wells. And at the receiver's request, ALCO was exempted from the freeze order so that it could operate these wells. And finally, this idea that this came up more in the briefing than in the argument, but federal receivers do not enjoy some sort of special power to operate free and clear of state law. This has come up in several orders in this very case. It's talked about in the 2012 and 2013 opinions from this court that everyone knew there were these state public health and safety laws that ALCO was racking up liability for. This is not a new thing that receivers can't come into Texas and parse out the best parts of the estate and inherits and then force those costs upon the taxpayers or anybody else to clean up. Unless there are any questions, we would ask that the court, I guess, remand and ask the district court to dismiss for lack of jurisdiction or affirm on the equitable grounds. Thank you. Thank you, Mr. White. Mr. Sullivan, your time has expired, but take two minutes of rebuttal, please. The Texas Railroad Commission just asserted that this is really a decision to be decided on the equities. And the equities are that the frauded investor funds fortuitously landed in Michael Wilson's hand. And he conducted one of the many frauds. That's what he did. The letter of credit was a fraud. The sale of the leases that he owned to Branson Energy Texas, a scam itself, a sham, was a fraud. And therefore, those transactions ought to be able to be unwound. And that is what the receiver thought it was doing with the freeze order. And as to what the Railroad Commission knew, I would ask the court to look at the affidavits of Attorney de Blasio, Attorney Katz, our own verified filings which discuss what happened and how often we talk to the Railroad Commission about these issues. There was never an issue of where the bond was and who it belonged to during the duration of this case. That's why when we did designate ALCO, who had been bought by Soane to operate the wells, and we're talking about operating the wells. We're not talking about the mineral interests at all. When that happened, we went out of our way to make sure that order said that it was at ALCO's expense and cost and discretion, and we didn't have anything to do with it. And you heard Attorney Katz say, they had nothing to do with the bond. That bond was outside of the deal. When Soane bought ALCO, they weren't buying a bond. It was outside of the deal. And that was the general makeup of things at the time. Judge, you asked about the discharging of liabilities. Where does the court get the power to do that? That is in the filings. Whenever we sold a property, the equity receivership through the court is able to dispel past liabilities. And we, too, are relying on that. Liabilities towards third parties who are not before the court? Liabilities touching an asset, discharging liabilities so that we can sell that asset. Sure, it affects third parties. By what authority? I mean, I can't tell you what authority that was at the time when it was breached. This has to do with the due process clause. If a third party, imagine what you're doing is discharging just an ordinary tort claim, that some stranger has against ALCO or the gas wells or something like that. By what authority does a district court in the receivership action say, bless you, go forth, you're exempt from liabilities from these people who are not in front of me? How does that work? Well, they did have notice, and they were involved in the case. And that's in the filings. But I know they were not a party. So where does that authority come from? Well, I think the authority does exist. I just can't cite it off the top of my head. I wasn't prepared for that to be an issue. But when these issues have come up in the past, and we have been able to discharge liabilities to clean up property, and we certainly counted on that. When we get an order that says all liabilities of ALCO are extinguished because they're associated with the fraud, because they're associated with Michael Wilson, and the orders do say that, they give the reason why those liabilities are extinguished, then we felt that we were able to rely on those too. So we didn't see that angle being used to also get rid of the problem. I assume you were drafting those orders. Right. We had a role in those. I mean, it would depend on the particular order. All right. Okay. Thank you very much, Mr. Sullivan. Thanks to all counsel. The case will be taken under advisement.